WILKINSON, ET AL. v. HARWELL.

1. When an agent sells land in the name of his principal, without authority to bind the principal, and the principal on being informed of the sale refuses to ratify and confirm it, the vendee may abandon the land, and the principal cannot, by afterwards offering to confirm it, enforce the contract.

Error to the Chancery Court of Macon.    Before the Hon. W. W. Mason, Chancellor.

HARWELL filed his bill against Wilkinson, Woodruff and Glenn, alledging, that on the 19th July, 1839, Glenn informed him that Woodruff was the owner in fee of many valuable tracts of land, in Macon county, and that he, Glenn, was his authorized agent to make sale of the same; and complainant being desirous to purchase, and believing the statements made by Glenn, he entered into a contract with him, as such agent, and purchased the south half of section 8, township 14, range 26; and also, the west half of the south-west quarter of section 9, in the same township and range, for the sum of $3,000—the first thousand to become due the first of January, 1840; the second, the first January, 1841; the third, first January, 1842; and executed and delivered to the said Glenn his three notes accordingly.  That the said Glenn, as the agent of said Woodruff, executed and delivered to the complainant, in the name of said Woodruff, a bond, in the penal sum of $6,000, conditioned to make titles for said land, to said complainant, upon the payment of the purchase money.   That complainant entered into said contract under the belief that Glenn was the duly authorized agent of Woodruff, to make sale and to execute title bonds, and that Woodruff was lawfully seized in fee of said land, free of all incumbrances.   Thus confiding, complainant went into possession, and erected comfortable buildings, and made improvements.

That just before the first note fell due, complainant met with Woodruff, and proposed to give him the bond executed in his name by Glenn; and to receive one from Woodruff himself, with the like condition, but that Woodruff refused, because Glenn had sold the land for less than he was authorized to sell it; but on an interview with Glenn, complainant was induced to believe, that Woodruff would carry out the contract, but Glenn informed him that Woodruff refused to accept the notes. That about the time the first note fell due, he was prepared to pay it, but understood that Woodruff had mortgaged the land to a company in Liverpool, and seeing Woodruff, he informed complainant that it was so. That he had never authorized Gleen to execute such a bond, that he considered it no sale, and that complainant was authorized to cancel it. That Woodruff further stated, that he had never given Glenn any written authority to sell the land. That at one time he verbally authorized him to sell the lands, but limited him as to the price at which he should sell, and that the price agreed to be given by complainant was much less than the limits prescribed to Glenn, and that since that interview, complainant looked upon the contract as ended, and from thence he considered that he was occupying at the will of Woodruff.

The bill also alledges, that complainant informed Glenn of what had passed, and gave him up the bond, and demanded the notes; that Glenn accepted the bond, but did not give up the notes. The bill also states, that the bond was afterwards placed in his bureau, without his knowledge or consent. That the land would have sold for a profit in 1840 and '41, but is now greatly depreciated in value. That in 1843, being threatened with a suit by the agents of Wilkinson, he agreed to abandon, and did abandon the premises, in the fall of 1843, and has not occupied them since.

The bill also alledges, that Woodruff is now insolvent, and unable to make a good title to the land. That suit has since been commenced in the circuit court of Macon, on said notes, in the name of Woodruff, for the use of Wilkinson, against complainant. He prays a perpetual injunction against said

suit; that the notes be cancelled and given up, and the contract be rescinded.

The bill is taken as confessed against Glenn. Wilkinson answers the bill from information and belief. He states, that Glenn, as the agent of Woodruff, made the contract, that he had authority to do so, and that Woodruff never repudiated it. That he is the agent of the firm in Liverpool, to whom the lands were mortgaged, and that he has full power over the mortgage, and offers to release it on the payment of the money. That Woodruff was lawfully seized in fee, and has never agreed to a rescission of the contract. That he never threatened the complainant with a suit, for the recovery of the land, nor did his attorney.

Woodruff answers, and states, that complainant purchased the land of Glenn, as described in the bill. That the land sold complainant was a portion of a large tract purchased by James N. Bethune, and respondent, of Eli S. Shorter, and that Shorter transferred the receiver's certificates to the respondent, and respondent and Bethune executed their notes to Shorter for the purchase money. That soon after said purchase, said Shorter died, and James O. Shorter was appointed administrator. That in 1837, some of the purchase money becoming due, the lands were transferred to one Hargrove, as a trustee for all parties, but with a reservation of the right in said defendant, to sell any of said lands, paying over the proceeds to said administrator. That the estate of said Shorter being largely indebted to T. M. Smith & Co., merchants of Liverpool, it was agreed that the administrator should transfer the notes of defendant and Bethune, in part payment. That the deed given to Hargrove should be cancelled, and that defendant and Bethune should execute a mortgage on all of said land, in favor of said firm, to secure the debt, which they accordingly did, on the 5th day of April, 1838, the debt being upwards of $48,000; which deed of mortgage contained a reservation of power, authorizing said Woodruff, or Bethune, to sell said lands, upon paying the purchase money, or proceeds, over to said mortgagees. The answer further states, that soon after the sale by said Glenn, the said defendant approved of it, and has never at any time disavowed it; and that he explained to complain-

ant the situation of the title and mortgage, before the first payment fell due, and he appeared satisfied with it. That he has often applied for payment, but has been put off with promises. That complainant applied to Wilkinson, for a bond for titles, and that Wilkinson promised to give him a bond, when he would make a liberal payment on the purchase, and never heard of any difficulty on the subject, except that complainant could not procure the money. That all the lands under the mortgage were sold in 1842, or 1843, except the lands sold to complainant.

The answer further states, that he, the defendant, never denied the agency of Glenn in selling the land; that the land was sold for less than he had authorized Glenn to sell it for, but that he approved the sale, and never authorized Glenn to give up the notes to complainant, or said any thing that would justify complainant in giving up the bond, nor does he know that he ever did give it up. He knows nothing of any agreement that complainant should abandon the land, and, by way of explanation, says, that the sale made to Hargrove was cancelled simultaneously with the execution of the mortgage.

George Pickett, a witness examined by complainant, says, that he knows the land, and the improvements put upon it; that they are worth about $1200; that the value of the land, in 1840, was about eight or ten dollars per acre; in '44 about seven; that complainant resided on the land until December, 1843, and then removed from it. That he knows nothing of the contract but what he has heard. That in a conversation with Woodruff, he heard Woodruff say, that he did not intend to abide by the contract made by Glenn, as he had exceeded his instructions, and was not a legally appointed agent; and in a subsequent conversation the witness had with Woodruff, in reply to a question, why he did not sue on the notes, as they were due, he said he did not expect Harwell would pay, that he would get tired and move, and that the improvements would pay for the time he occupied it; and that he, Woodruff could not make titles. That these conversations with Woodruff were in 1842. He also states, that he heard Woodruff say, he was broke.

McKinley, a witness, states, that 100 or 125 acres are

cleared, and values the improvements at $1200. That Harwell resided on it from 1840, to December, 1843, and no person has lived upon it since. That in 1840, such land was worth nine dollars per acre, without any improvements, and in 1846, not more than five dollars per acre. He knows nothing of the purchase, but heard Woodruff say, that Glenn had come under the limits, and that he would not abide by it. Does not recollect the year he heard Woodruff say this. Woodruff is insolvent, and was in 1840.

Fields, another witness, knows the land, and it has depreciated since 1840. Woodruff told this witness in 1841, that he had verbally authorized Gleen to sell the lands for a certain price ; but that Glenn had sold them to complainant for less than he was authorized, and that he, Woodruff, was not legally bound to stand to the trade ; yet he was willing to make titles, when complainant paid for it. Witness does not know complainant abandoned it.

The court rendered a decree cancelling the contract, and perpetually enjoining the suit on the notes.

From this decree the respondents prosecuted a writ of error to this court.

CAMPBELL, for plaintiff in error.

The bill is filed by Harwell to cancel the notes given by him on a contract for the purchase of land of one Woodruff. The bill sets out two grounds : 1. That the contract had been canceled. 2. That Woodruff's title was defective in this, viz : that he had mortgaged the land to W. D. Wilkinson and to George Hargrove.

The first ground is the one mainly relied on, and has been fully argued in the briefs on file.

The second ground is answered as follows: Wilkinson, who holds the mortgage for the land, is a defendant to the bill, and is the holder of the notes, and offers to confirm the sale.

This mortgage to T. W. Smith & Co. contains a reservation of the power of Woodruff or Bethune to sell the lands, and to pay over the proceeds to Smith & Co.

Smith & Co. and Wilkinson are identical in interest.

In regard to the deed to Hargrove, Wilkinson asserts in

his answer, that Hargrove never accepted or acted on it, and that it was rejected by him, and that he is willing to release it.

These being the facts, the existence of an outstanding title in Bethune does not appear from the bill; and even if such outstanding title did exist, it could not be established. The allegations of the bill do not authorize the proof of such a deed. 3 Ala. R. 421. There is, however, no difficulty on this point when the earliest mortgage—the mortgage to Wilkinson, is examined. That mortgage contains a reservation of a power to each of the parties to sell the lands embraced by it. To this deed Bethune is a party.

The conveyance to Hargrove is treated on all hands as of no validity. It was made while Harwell was in possession of the lands under a contract of sale, and consequently, if Hargrove had paid for the land, his title would not have prevailed over the prior equity of Harwell. Wilkinson states in his answer, that this title is worthless, and offers to procure it.

Under these facts, I submit that the chancellor should have pronounced a decree, declaring that no rescission of the contract had taken place, but that the same was binding, and if the plaintiff desired it, to direct a reference to the master, to inquire whether Wilkinson and Woodruff were able to make perfect titles to the lands, and if so, the decree should be reversed.

G. W. Gunn, contra.

DARGAN, J.—A court of equity will not enforce the specific performance of a contract, unless it be mutually binding on both parties; and if one party is not bound by the contract, the other may disavow it, and a court of equity could not enforce it. See 6 Leigh's Rep. 175; 6 Paige's R. 288; 2 Bibb, 98; 1 Humphries, 294. This being the rule of law, the first question is, was Woodruff bound by the bond executed in his name by Glenn? The answer states, that Glenn had exceeded his authority in selling for less than he was authorized to sell for, but admits he was authorized to sell, but whether his authority was conferred by parol, or under seal,

84

is not stated. But it is shown by the testimony of Fields, that Woodruff said, he had verbally authorized Glenn to sell the land. Under these circumstances, Woodruff was not bound by the bond on the day, or at the time it was executed and delivered: First, because Glenn, the agent, had exceeded his authority in selling for a less price than he was authorized. And secondly, because his authority being merely by parol, he could not bind his principal under seal, and thereby Woodruff was not bound as by a bond, and the contract was that Woodruff should be bound by bond. There was then no mutuality in the contract, at the time it was executed. Has it been ratified, and confirmed by the defendant Woodruff? or did he do it, upon being informed of the contract and its terms?

The answer states, that in a short time after the sale was made, he (Woodruff) ratified and approved of it, although Glenn had sold the land for less than he had been authorized to sell for. But the proof does not corroborate the answer; on the contrary, Pickett states, that in the year 1842, he heard Woodruff say, that Glenn had exceeded his authority, and that he would not abide by the contract; and in another conversation, he stated as a reason why he did not proceed to collect the notes which were all due, that he did not expect Harwell would pay them, and that he would get tired after a while and move off, and the improvements would pay for the time he occupied it. McKinsly, another witness, heard him say, that Glenn had come under his limits, and that he would not abide by the contract. Fields, another witness, heard him say in 1841, that he had verbally authorized Glenn to sell the land, but that Glenn had sold the land for less than he was limited to sell at, and that he (Woodruff) was not legally bound to stand to the trade, yet he was willing to make titles, when the money was paid. Even the testimony of Fields, which is the most favorable to the defendants, does not show that he (Woodruff) admitted a legal liability on the bond, but after denying his legal liability, he merely adds, that he was willing to make titles, when the money was paid. But in 1842, he stated to Pickett, as the witness deposes, that he would not abide by the contract.

From this testimony, we cannot come to the conclusion of

fact, that Woodruff, the defendant, on being informed of the contract, and its terms, ratified and approved of it, in a manner to bind him by the bond, thereby giving mutuality to the contract, and legal liabilities and rights to each party; and although he now admits by his answer that he did, yet he cannot now ratify it, and thus take advantage of the rise, or fall, in the price of land, and thereby speculate on a contract to which he was a party, and if an advantageous one, he would be bound by it—if not, he would not be bound. And as the testimony shows, that he denied he was bound by the contract in 1842, and according to the answer, was not bound by the bond at the date of its execution, his assertion in his answer, that he did approve of the contract, without proof showing when and how he did it, cannot now be received as evidence of a confirmation of the contract; more especially, as the value of the lands has greatly depreciated, and have been for several years abandoned by complainant.

The bond was not binding on Woodruff at the date of its execution, and he did not *ratify and confirm* the contract on being informed of it, and it is now too late for him to do it by his answer. The consequence is, there is a want of mutuality in the contract, and we can see no error in the decree. It must be affirmed.